JONES *et al. v.* SOUTHERN INS. CO.

*(Circuit Court, E. D. Arkansas.* February 3, 1889.)

1 INSURANCE—CONDITIONS IN POLICY—KEEPING BOOKS.
A policy contained covenants that the assured was to keep a set of books showing a record of all business transacted, and to keep them locked in a fire-proof safe at night and at all times when the store was not actually open for business; such books to be produced in case of loss, and, on failure to produce them, the policy to be null and void. In a suit on the policy the evidence showed that it was customary for merchants to keep their stores open for business as late as 9 or 11 o'clock at night, and the loss occurred about 9 o'clock at night, while the store was open for business, and while plaintiff was writing up his books. *Held,* that the covenant did not require the books to be kept in a safe from sunset to sunrise, but from the time the business of the day was ended, and the store closed for the night.

2. SAME.
The covenant to keep books, and the covenant to keep them in a safe, must be construed together, and; in the absence of an express stipulation to the contrary, the covenant to keep books should be construed to mean that they shall be kept in the time and manner customary with merchants.

At Law. Action on a policy of fire insurance.

On the 1st day of October, 1887, the defendant issued to the plaintiffs a policy of insurance for $3,000, against loss by fire on their stock of general merchandise in their store-house at Riverside. The store-house and goods, and most of the plaintiffs' mercantile books, were destroyed by fire, and this is a suit to recover the amount of the policy. The policy contains this clause:

"The assured, under this policy, hereby covenants and agrees to keep a set of books, showing a complete record of all business transacted, including all purchases and sales, both for cash and credit, together with the last inventory of said business; and further covenants and agrees to keep such books and inventory securely locked in a fire-proof safe at night, and at all times when the store mentioned in the within policy is not actually open for business, or in some secure place, not exposed to a fire which would destroy the house where such business is carried on; and, in case of loss, the assured agrees and covenants to produce such books and inventory, and, in the event of the failure to produce the same, this policy shall be deemed null and void, and no suit or action at law shall be maintained thereon for any such loss."

Two grounds of defense are interposed: (1) That the fire occurred "at night," and that the plaintiff's mercantile books were in the store and burned, and were not, as required by the terms of the policy, in a fire-proof safe, or other place secure from destruction by a fire which would destroy the store-house. (2) That the fire occurred at a time when the store was "not actually open for business," and that the books were in the store-house, and not in a fire-proof safe, and were burned. The facts are that the fire occurred about 9 o'clock P. M. on the 9th day of December, 1887; that the plaintiffs had a fire-proof safe in their store-house, in which their mercantile books were kept when not in use; that it was the plaintiffs' custom, upon opening the store in the morning, to take the books out of the safe, and lay them on the counter for use during business hours, and they were kept out until the business of the day was closed, and the books posted and written up, when they were put in the safe, which was then locked; that the books were written up during the evening of each day, after the rush of business was over. The store was kept open for customers and business transacted until 8 or 9 o'clock, and on occasions as late as 11 o'clock at night; and customers coming during these hours were always admitted and waited upon, though at times during these hours the front door was locked to prevent the intrusion of improper characters who might depredate on the stock without detection owing to the construction of the store-room, and the imperfect method of lighting it at night, but the door was always opened to customers knocking for admission, and business was carried on until 8 and 9, and sometimes as late as 11, o'clock at night. This mode of conducting the mercantile business was common with merchants in the town and in that region of the country, and was essential to their success in trade. When the fire broke out, the front door of the store-house was locked, but the business of the day was not closed, and the door would have been opened to any one knocking for admission. The clerk was engaged in writing up the day's business in the books, and had not completed his work, when, upon invitation, he stepped into a store next door to eat a plate of oysters, and while in there he discovered the fire. When the fire broke out one of the plaintiffs, who carried the key to the safe, was in his family room, which connected with the store-room, waiting to put the books in the safe, according to custom, as soon as they were written up and the business of the day over, and the store closed for the night.

*J. M. Moore*, for plaintiffs.
*U. M. & G. B. Rose*, for defendant.

CALDWELL, J., (*after stating the facts as above.*)     Literally, night is that part of the natural day between sunset and sunrise.     Are the words "at night," in the policy in suit, to be given that meaning?  The object of this clause is to provide against the loss of the merchants' book by fire.  The loss of the books by fire in the day-time is just as injurious as their destruction at night.     Why, then, did not the insurer stipulate that the books should be kept secure from destruction by fire at all times?  For the obvious reason that the books must be used during the time that the business is carried on, and to that end they must be kept on the desk or counter of the store.     But after the business of the day is over, and there is no longer occasion to use the books, and the store is closed for the night, there is no hardship in requiring that they shall not be left to the hazard of destruction by fire.     Besides, as long as there is some one in the store, transacting or conducting any of the necessary business operations of the store, there is the chance that in case of fire the books may be saved; but that chance is gone when the store is closed for the night.     In the construction of contracts the customary signification of words prevails over the literal, grammatical, or classical meaning.     The situation of the parties, the subject-matter of the contract, and the customs and usages of trade, to which it relates, will all be considered.   It is a canon of construction that all words, "if they be general, and not express and precise, shall be restrained unto the fitness of the matter or person."   Numerous illustrations of this rule are to be found in insurance cases.   In a policy of insurance against "restraint of kings, princes, and people of what nation, condition, or quality soever," the rule was applied, and "people" was construed to mean ruling powers, and not individual marauders.   2 Whart. Cont. § 667.   A policy covered a ship, and tackle, apparel, and furniture "of and in the said ship," and the tackle, apparel, and furniture were taken out of the ship, and put in a warehouse to keep them dry while the ship was heeled and cleaned; and while so in the warehouse they were destroyed by fire.   The insurers insisted they were not liable, because the articles were not destroyed "in the ship."   It will be observed that the requirement that the articles should be "in the ship" was as explicit as the requirement in the policy in suit that the books shall be "in a fire-proof safe at night."   It was found in that case, as it is in this, that the course pursued by the insured was according to the necessary and usual course of business, and the court held the loss was covered by the policy.   "It is certain," said one of the judges, "that in the construction of policies the *strictum jus* or *apex juris* is not to be laid hold on; but they are to be construed largely for the benefit of trade. *   *   *   The construction should be according to the course of trade." *Bond* v. *Gonsales*, 2 Salk. 445; Wood, Ins. § 59.   The construction contended for by the insurer in this case is not according to the course of trade, but so contrary to it, that it would inevitably ruin any country merchant who should attempt to conform to it.   The proof shows that

at some seasons of the year, merchants in the country and villages do an active business till a late hour of the night. Goods are sold for cash, and on credit, payments are made, commodities purchased, accounts rendered, and settlements made, until 8 or 9 o'clock at night, the same as in the day-time. No merchant could sustain himself in business who closed at sunset. The business transacted during the early hours of the night is identically the same as that transacted in day-light, and the necessity for the presence of the books, and their constant use, the same. Merchants cannot conduct their business without books. The policy in suit makes the assured covenant "to keep a set of books showing a complete record of all business transacted, including all purchases and sales, both for cash and credit." This covenant can only be kept by having the books at the desk and counter, open and accessible at all times when the business is going on. If the defendant's construction of the policy in suit is the true one, then merchants holding such policies must absolutely cease to do business at sunset; for the policy obliges the insured to keep a set of books showing a complete record of all business transacted; and if the insured must keep such books securely locked in a fire-proof safe from sunset to sunrise, it is obvious no business can be transacted between these hours. Suppose the policy had contained a stipulation that "some person shall sleep in the store-house at night." Would such a clause be construed to require some person to go to bed, and go to sleep, at sunset, and sleep continuously till sunrise? The clause, construed literally, would require this. The law rejects such literal and hypercritical interpretation of words in a contract. A contract will not be construed as demanding unreasonable things, or things contrary to the known necessities, custom, and usage of trade, or of the parties, if it is susceptible of any other construction. And "in all cases the words of a policy are to be taken most strongly against the insurer," (Wood, Ins. § 57,) and "are to be construed in cases of doubt against the insurer," (Id., and 2 Whart. Cont. § 670, and note 4;) and, "when capable of two meanings, that meaning is to be adopted most favorable to the insured," (Id.) "The courts will not permit the assured to be misled, or cheated, where there is any sort of justification, from the language used, for the interpretation placed by him upon the instrument. A contract drawn by one party, who makes his own terms, and imposes his own conditions, will not be tolerated as a snare to the unwary; and if the words employed, of themselves, or in connection with other language used in the instrument, or in reference to the subject-matter to which they relate, are susceptible of the interpretation given them by the assured, although in fact intended otherwise by the insurer, the policy will be construed to favor the assured." Wood, Ins. § 59.

The plaintiffs had every reason to suppose the policy permitted them to pursue their accustomed mode of doing business, which was the necessary and usual mode of doing business in that country, and the defendant must be presumed to have so understood it. *Daniels* v. *Insurance Co.*, 12 Cush. 416. The proper construction of the policy is not that the books shall be kept in the safe from sunset to sunrise, but that

they shall be so kept from the time the business of the day is ended, and the store closed for the night. It is part of the business day, and not "night," within the meaning of the policy, so long as the store is kept open and business transacted, though it be 8, 9, or 10 o'clock at night; in other words, within the meaning of the policy, night begins when the business for the day ends. What has been said disposes of the defense that the store was "not actually open for business" at the time of the fire. The fact is found that it was so open. The circumstance that the door was locked, so that customers had to knock for admission, has no significance in the light of the evidence. When they knocked they were admitted and waited upon. A store is "actually open for business" when it is lighted up and the merchant or his clerk is there ready, able, and desirous to sell goods, or do anything else that constitutes a part of the work or labor of conducting the mercantile business. A store is as much "open for businesss" while the merchant is waiting for customers, during his customary business hours, as it is when the customers are present. An essential and indispensable part of the daily business was actually in progress when the fire broke out. The clerk was writing up the day's business in the books, in accordance with the custom and usage in country stores, where the salesman does duty as book-keeper also,—country merchants rarely employing professional book-keepers. This work was going on in strict compliance with the covenant exacted from the plaintiffs by the defendant; and if the defendant desired to prohibit the plaintiffs from complying with this covenant by doing the work in the store after sunset, in accordance with the custom and usage of country merchants, it should have inserted a stipulation in the policy to that effect. The covenant to keep books, and the covenant to keep them in a safe, must be construed together, and, in the absence of an express stipulation to the contrary, the covenant to keep books will be construed to mean that the books shall be kept in the time and manner usual and customary with merchants. Judgment for plaintiffs for the amount of the policy.