## GERMAN AMERICAN INS. CO. v FULLER.

No. 348.    Opinion Filed July 12, 1910.

(110 Pac. 763.)

1.  INSURANCE—Breach of Warranty — Keeping Books. Books showing "all purchases and sales, both for cash and credit," within the meaning of a covenant and agreement in a policy of fire insurance requiring the insured to keep a set of books showing a complete record of business transacted, including all such purchases or sales, need only be such as will fairly show these matters to a man of ordinary intelligence.

2.  INSURANCE—Action on Policy—Evidence — Sufficiency. Evidence examined, and held not sufficient to show substantial compliance with "fireproof safe" clause in fire insurance policy.

3.  INSURANCE—Breach of Warranty—Keeping Books—Fire Proof Safe. Where the assured in a policy insuring a stock of merchandise against fire agrees to keep his books in a fireproof safe at night and at all times when his place of business is not open for business or to keep them in some secure place not exposed to a fire, which would destroy the house wherein he kept said stock for sale, he cannot recover on said policy for a loss incurred if such books, inventories, etc., as he kept were destroyed at night while kept on a counter or in drawers in said building, instead of in said safe.

(Syllabus by the Court.)

*Error from District Court, Pontotoc County; Joel Terrell, Judge.*

Action by R. H. Fuller against the German American Insurance Company. From a judgment in favor of plaintiff, defendant brings error. Reversed and remanded.

*Clinton A. Galbraith* and *Tom D. McKeown,* for plaintiff in error.—Citing: *Yates v. Thomason,* 83 Ark. 126; *Western Assurance Co. v. Altheimer,* 58 Ark. 575; *South. Ins. Co. v. Parker,* 61 Ark. 207; *Pelican Ins. Co. v. Wilkerson,* 53 Ark. 353.

*Duke Stone,* for defendant in error.—Citing: *Insurance Co. v. Kearney,* 180 U. S. (45 L. Ed. 460); *Jones v. Insurance Co.,* 38 Fed. 19; *Insurance Co. v. Jones,* 15 S. W. 1034; *Insurance Co. v. Heflin,* 60 S. W. 393; *McNutt v. Insurance Co.,* 45 S. W. 61; *Insurance Co. v. Redding,* 15 C. C. A. 621; *Insurance Co. v. Cummings,* 78 S. W. 716; *Insurance Co. v. Pearlstone,* 45 S. W. 832; *Insurance Co. v. Woolverton,* 102 S. W. 226.

KANE, J.  This was an action on a fire insurance policy, commenced by the defendant in error, plaintiff below, against the plaintiff in error, defendant below.  The petition alleged a total loss of the property by fire, a compliance with the terms of the policy by the plaintiff, a demand for payment, and refusal.  The answer contained a general denial of the allegations of the petition, except the facts specifically admitted, namely, the incorporation of the defendant, the issuance of the policy, its amount, and the loss of the property.  By way of affirmative defense, the answer alleged breaches of the contract of insurance by the plaintiff, in that he failed to keep and produce after the fire an itemized inventory of his stock and a cashbook, showing sales for cash and on credit, and an inventory of the goods purchased since the last inventory, and failed to keep these books in an iron safe at night and when his store was not open for business, and that by reason of these breaches of the contract an action could not be maintained thereon.  The reply was a general denial.  Upon trial to a jury a verdict was returned in favor of the plaintiff, upon which judgment was entered, to reverse which this proceeding in error was commenced.

The plaintiff in error assigns a great many errors, but the principal grounds upon which they base their right to a reversal are:  That the plaintiff failed (1) to preserve the last inventory of his stock and to produce it after the fire, as he agreed to do in

his contract of insurance; and (2) that he failed to keep and preserve a cashbook showing sales for cash and on credit, as he agreed to do in his contract of insurance by keeping such books and inventory and also the last preceding inventory securely locked in a fireproof safe at night, etc. The following are the covenants. of the contract necessary to be noticed to pass upon the questions raised:

"The following covenants and warranties on the part of the assured and conditions on the part of the ———— Insurance Company, of ————, are hereby made a part of the policy to which this clause is attached: 1st. The insured will take an itemized inventory of the stock hereby insured at least once in each calendar year, and, unless such inventory shall have been taken within twelve (12) calendar months prior to the date of this policy, the same shall be taken in detail within thirty (30) days after said date, or this policy shall be null and void from and after the expiration of said thirty days, and upon demand of the assured, within three months from the date of this policy, the unearned premium for the unexpired time of this policy shall be returned. 2nd. The assured will keep a set of books, which shall clearly and plainly present a. complete record of the business transacted, including all purchases, sales and shipments of such stock both for cash and credit, from the date of the inventory provided for in the first section of this clause and during the continuance of this policy. 3rd. The assured will keep such books and inventories, and also the last preceding inventory, securely locked in a fireproof safe at night, and at all times when the building mentioned in this policy, or the portion thereof containing the stock described therein, is not actually open for business; or, failing in this, the assured will keep such books and inventories at night, and at all such times, in some place not exposed to fire which would ignite or destroy the aforesaid building; and, in case of loss, the assured specifically warrants, agrees, and covenants to produce such books and inventories for the inspection of said company. In the event of a failure on the part of the assured to keep and produce such books and inventories for the inspection. of said company, this entire policy shall become null and void, and such failure shall become a perpetual bar to any recovery thereon."

The policy was executed prior to statehood and while the

laws of Arkansas were in force in the Indian Territory, and is an Arkansas contract.

Counsel for defendant in error does not claim that there was a literal compliance with the foregoing clauses of the policy, but contends that "there was such a substantial compliance with the 'iron-safe clause' in the case at bar as to entitle the plaintiff to recover." Prior to the enactment of the act of March 29, 1899 (Kirby's Dig. § 4375a), by the Legislature of the state of Arkansas, the "iron-safe clause" in fire insurance policies was held by the Supreme Court of that state to constitute a promissory warranty, and a strict compliance with the terms thereof was declared necessary to entitle the assured to recover thereon. *Pelican Insurance Company v. Wilkerson,* 53 Ark. 353, 13 S. W. 1103; *Western Assurance Company v. Altheimer,* 58 Ark. 565, 25 S. W. 1067; *Southern Insurance Company v. Parker,* 61 Ark. 207, 32 S. W. 507. On the first contention of counsel for plaintiff in error, the rule to determine the duty of the insured in relation to keeping books, etc., is stated by the Supreme Court of the United States in *Liverpool & London & Globe Insurance Company v. Kearney et al.,* 180 U. S. 132, 21 Sup. Ct. 326, 45 L. Ed. 460, as follows:

"Books showing 'all purchases and sales, both for cash and credit,' within the meaning of a covenant and agreement in a policy of fire insurance requiring the insured to keep, a set of books showing a complete record of business transacted, including all such purchases or sales, need only be such as will fairly show these matters to a man of ordinary intelligence."

And on the question of the failure of the insured to produce the books and inventory required by the covenant the court held that:

"Failure of an insured to produce the books and inventory as required by a policy of fire insurance under penalty of forfeiture means a failure to produce them, if they are in existence when called for, or if they have been lost or destroyed by the fault, negligence, or design of the insured."

The assured did not keep and was unable to produce after the fire the last inventory of his stock, and record of the sales for cash

and on credit, and a record of the purchases made between the date of the last inventory and the fire. What he contended was a substantial compliance with the covenants of the policy was the production of a ledger in which the totals of the last inventory of his stock taken in January, 1907, six months prior to the fire, had been transferred, and an attempt to show by the evidence of witnesses who had been in his store just prior to the fire that the stock carried was larger than when the inventory was taken, and by introducing duplicate accounts of wholesale houses of goods purchased between the time of the taking of the last inventory, and the fire on the 1st day of January, 1907, and by showing the credit sales and the various accounts with customers, as charged in said ledger during this period, and by introducing a leaf from the ledger of the bank where he kept his accounts, to prove the amount of his cash sales during said period. Excerpts from the evidence of the plaintiff and his bookkeeper will show more clearly the acts of compliance with said covenants on the part of the assured.

Mr. Fuller testified:

"Q. You didn't keep a correct record? A. We didn't keep any regular cashbook. Q. What was kept was destroyed by fire? A. Yes. * * * Q. Now, these cashbooks that were lost show sales for cash at the date of the inventory in January to the date of the fire? A. Yes; they might have done it. I could not say. I was not there all the time. Sometimes a man would put it in the books, sometimes just go throw it in the drawer. * * * Q. You paid any expenses that might arise out of there. You paid that out of the business? A. Yes. Q. Well, now this money put in the banks is the balance or residue of what you had left? A. We paid Mr. Whitaker money every week, cash every week, but the rest we deposited in the bank."

Mr. Whitaker was a traveling salesman for a wholesale grocery house from whom Mr. Fuller bought groceries. How much was paid out for expenses, and how much was paid cash every week to Mr. Whitaker, does not appear.

Mr. Bradshaw, the bookkeeper, testified as follows:

"Q. What did you do with the record of the daily cash sales of that business as you went along? A. It got burnt up too. Q.

What did you do with the money and checks received? I mean the money received in cash sales. A. That we paid out to creditors and kept in the safe. Q. What did you do with it then? A. Used it in the business. Q. Kept it in the safe? A. Deposited it in the bank. Q. What bank did you put it in? A. First National Bank of Stonewall. Q. When you made these deposits in the bank, what record did you keep? A. Kept a record in the ledger, also had the deposit slips. Q. Where are the deposit slips received from the bank? A. I could not tell exactly now. Q. Were they left in the store? A. Yes, sir."

Again, in relation to the system of bookkeeping, he testified:

"Q. Was it a regular cashbook? A. No; we just kept the amount on books like this. Each sale we made we ran the date. It laid right there on the drawer, we kept them out, and at night we totaled them up. Q. So that book was destroyed? A. Yes. Q. Do you know the amount sold? A. No; we estimated it. Q. How did you estimate it? A. Took an average from the amount of money deposited in the bank. Q. Was all the cash and the checks deposited in the bank? A. No; we sometimes paid our wholesale men in checks and so on."

Again:

"Q. You say the cash account, the books you kept the daily cash sales on, were destroyed, were they not, in the fire? A. Yes, sir."

The question then arises, Does this evidence fairly show to a man of ordinary intelligence that the assured kept books showing all purchases, his sales, both for cash and credit, as by the terms of the policy he was required to do? This question must be answered in the negative. In arriving at this conclusion, we have not overlooked the rule that the insurance company dealt with the assured as a country merchant, and is presumed to have contracted with reference to the customs of his business. *Jones et al. v. Southern Ins. Co.* (C. C.) 38 Fed. 19. But this does not absolve the insured from compliance with the terms of the policy to the extent indicated by the rule laid down by the Supreme Court of the United States, heretofore referred to. Even the bookkeeper for the concern stated that the system of bookkeeping was so meager that the amount of the sales had to be estimated,

and, as data for this estimate, he "took an average from the amount of money deposited in the bank." How unreliable this data was is apparent from the evidence of the assured and his bookkeeper to the effect that all the cash derived from sales was not deposited, but that part of it was used to pay Mr. Whitaker, the representative of the wholesale grocery company, part of it to defray other current expenses, and deposited the balance. We are fully convinced from a careful examination of the evidence that there was not sufficient competent evidence available to supply the information Mr. Fuller bound himself to furnish, and that, even considering all the evidence that was admitted at the trial, a large part of which we think was incompetent, he fell short of supplying the necessary proof to entitle him to a verdict.

It is not quite clear upon what ground counsel for defendant in error justified noncompliance with that part of the third paragraph of the "warranty to keep books and inventories and to produce them in case of loss," which required him to keep such books, inventories, etc., as he had, securely locked in a fireproof safe at night. It is quite clear that this had not been done. In the case of *Southern Ins. Co. v. Parker, supra*, Mr. Justice Riddick said for the court:

"This court in *Western Assurance Co. v. Altheimer*, 58 Ark. 575, 25 S. W. 1069, said of a similar provision that 'the stipulations of the "iron-safe" clause constituted an express promissory warranty in the nature of a condition precedent,' and that a strict compliance with it was necessary. In his work on insurance Mr. Wood also says that such promissory warranties must be strictly performed, 'and that, too, without reference to the question whether they were material to the risk. The insurer is permitted to judge for himself upon what conditions he will assure a risk, and what is material thereto, and, if he sees fit to insert immaterial conditions in the policy, the assured cannot defend against a breach thereof upon that ground. * * * The assured has no election, but must stand upon his performance of them.' 1 Wood on Fire Insurance, p. 448. * * * However inconvenient it may. have been, he had expressly agreed that the saloon books should be kept in a fireproof safe at night, or in some place secure

from a fire that might destroy the house where the insured goods were kept, and he should have complied with his contract. He failed to do so, and as a result of that failure the books were destroyed by the fire that burned the house. For this reason the judgment against the appellant company cannot be sustained."

A later case on this subject is *Yates v. Tomason,* 83 Ark. 126, 102 S. W. 1112.

There are a great many cases cited by counsel for both parties and a great many points argued, but to our mind the foregoing completely cover the questions necessary for a decision of this case, and we do not deem it necessary to notice at length any others. The construction of the "fireproof safe" clauses in fire insurance policies has been before the courts of this country many times, but we are not aware of a case where a judgment in favor of plaintiff has been allowed to stand upon such a meager compliance therewith as is shown in the case at bar.

The judgment of the court below must be reversed, and the cause remanded, with directions to grant a new trial.

All the Justices concur.