SCOTTISH UNION & NATIONAL INS. CO. *et al.* v.
MOORE MILL & GIN CO.

Nos. 3403-3407.    Opinion Filed May 26, 1914.

Rehearing Denied September 22, 1914.

(143 Pac. 12.)

1.    INSURANCE—Blanket Policy—What Constitutes. A policy for
''$5,000 on their unginned cotton while contained in six frame
warehouses, * * *'' placing, as it does, no specific amount
on each of the warehouses, is a blanket policy.

2.    SAME — Fire Policy — Construction — Book Warranty Clause —
Pleading—Defense. A breach of the clause in a fire insurance
policy '' * * * that the assured will keep a book containing
a faithful record of all cotton put into or taken from the gin or
cotton house and that such record will be produced in case of
loss,'' being defensive matter, is properly set up by answer and
issue joined thereon by reply. It refers only to future transac-
tions, and requires the insured to keep such record beginning with
the date of the policy or the attachment of the risk.

3.    SAME—Compliance with Condition—Sufficiency. It is a general
principle that the purpose of said clause is accomplished when
the assured produces data from which the amount and value of the
cotton insured and destroyed at the time of the fire can be rea-
sonably ascertained; a substantial compliance with the warranty
therein contained is sufficient.

4.    SAME—Action on Policy—Submission of Issues—Evidence. With-
in a few days after the loss an adjuster for defendant and another
adjuster for an insurer in interest visited the scene of the loss,
with power to adjust the same, whereupon the insured turned
over to them for that purpose all books and records kept by the
insured pertaining thereto, from which they ascertained the amount
in pounds of cotton in the warehouses destroyed at the time of

the fire, which amount was agreed to by both, insurer and insured, and that the only question between them was the value of the cotton destroyed. Held, sufficient to take to the jury the question whether the insured had complied with the terms of said "book warranty clause."

5. SAME—Action on Policy—Amount of Loss—Sufficiency of Evidence. Evidence examined, and held to reasonably tend to prove the amount of cotton that went into and was taken from the warehouses after the risk attached and up to the time of the loss and the extent of the loss.

6. SAME—Evidence—Admissibility. In determining the amount of damage for the destruction by fire of boll cotton covered by a policy which contains a three-fourths loss clause and further reads, "This company shall not be liable beyond the actual cash value of the property at the time any loss or damage occurs or its actual cash value at that time," it is not reversible error for the court to permit a witness to testify that the same was $2 per hundred at the time of the loss, and on cross-examination that, in his judgment, it would have brought that amount net after it had been ginned and sold upon the market.

7. SAME—Action on Blanket Policy—Apportionment of Loss. When it developed in a suit on a blanket policy, placing, as on one item of insurance "$5,000 on their unginned cotton while contained in six warehouses; * * *" that the same property was covered by four other blanket policies in other companies aggregating $20,000 and three other blanket policies in another company aggregating $2,500, and where said policy reads: "It is hereby agreed that in case of loss this policy shall attach in or on such building or division in such proportion as the value in or on each building or division bears to the aggregate value of the subjects insured"—held that the share of loss to be paid by defendant is 5000-27500 of the loss, and that it was not necessary, in order to apportion the loss, to determine the amount of loss or damage on each warehouse.

(Syllabus by the Court.)

*Error from District Court, Grady County;*
*Frank M. Bailey, Judge.*

Action by the Moore Mill & Gin Company against the Scottish Union & National Insurance Company and others. Judgment for plaintiff, and defendants bring error. Affirmed.

*Burwell, Crockett & Johnson,* for plaintiffs in error.

*Chas. M. Fechheimer* and *Keaton, Wells & Johnston,* for defendant in error.

TURNER, J.  On November 30, 1907, in the district court of Greer county, Moore Mill & Gin Company, in five separate actions (subsequently by agreement transferred to the district court of Grady county), sued Scottish Union & National Insurance Company, Palatine Insurance Company, National Fire Insurance Company, German-American Insurance Company, and Commercial Union Assurance Company, to recover on five insurance policies for $5,000 each issued to plaintiff by the respective defendant companies.  The first four covered the same property, and read $5,000 on "their unginned cotton while contained in six frame warehouses" located on certain blocks in Mangum; that of the last-named defendant covered both ginned and unginned cotton located at the same place, all the property of plaintiff.  Each of the policies was dated February 21, 1907, except that of the last-named defendant, which was of date March 4, 1907.  The pleadings being the same in all the cases, they were tried together by agreement, and resulted in a judgment for plaintiff for the full amount of each policy, and defendants bring the case here.

The petition substantially states that at the time of the loss the insured property was of the cash value of $52,000, that the same was destroyed by fire on April 22, 1907, except 746,910 pounds thereof, of the cash value of $4,000, and that the total loss was $48,000.  It further alleged that, in addition to the five policies above named, the Virginia State Insurance Company had three policies outstanding on said property, that is, one for $1,500, one for $750, and one for $250.  It was further alleged that each of the policies sued on was due and payable to plaintiff; that it had given notice of loss and performed all conditions precedent to its right to recover prescribed therein; that within 60 days it had furnished defendant with proofs of loss, and "that the defendant, through its duly authorized agent, waived any further or other notice or proof of loss, and agreed with plaintiff that no question would be raised as to the plaintiff having complied with the terms and conditions of the policy, and that the only question in dispute between the plaintiff and defendant was, and should be, the amount of loss sustained by

plaintiff and recoverable under the terms of said policy." And, after alleging that more than 60 days had elapsed since proof of loss had been furnished as required, and that defendant had refused to pay the loss, plaintiff prayed judgment for the full amount of the policy.

Counsel for plaintiff in error assign that the court erred in overruling its objection to the introduction of any evidence in support of the petition because, it says, the same fails to state facts sufficient to constitute a cause of action.

The policy reads:

"$5,000 on their unginned cotton while contained in six frame warehouses.   *   *   *

"Pro Rata Clause:   It is hereby agreed that in case of loss, this policy shall attach in or on each building or division in such proportion as the value in or on each building or division bears to the aggregate value of the subjects insured."

But for this provision, says plaintiff in error, the policy would be a blanket policy; containing it, it says, the same is a specific policy.   The policy further reads:

"Three-Fourths Loss Clause:   It is understood and agreed to be a condition of this insurance that, in the event of loss by fire of the property described herein, this company shall not be liable for an amount greater than three-fourths of the actual loss on each item of property described herein· (not exceeding the amount insured on each such item), and in the event of additional insurance hereon, this company shall be liable for its proportion only of three-fourths of such loss on each item not exceeding the amount insured on each such item.   Other concurring insurance permitted but total insurance shall at no time exceed three-fourths of the cash value of each item of the property described herein."

"Therefore," says plaintiff in error, "*   *   * considering these two provisions together, that is, the *pro rata* clause and the three-fourths loss and co-insurance clause, it is plain that the defendant in error would not be entitled to recover anything on its policies until it had shown the amount of loss in each of the warehouses."

"And, it being necessary for defendant in error to prove the amount of loss or damage in each warehouse, it must conclusively follow that it was necessary to allege it in its petition."

Not so.   Written as it is, this is a specific policy, which places $5,000 on plaintiff's unginned cotton while contained in six frame warehouses as one item.   Had the policy distributed the $5,000 among the several warehouses as separate items of insurance by placing a specified amount on each item, there might have been merit in the contention.   But such it does not do, and, the form of policy being such that this might have been done had the insurer chosen so to write it, it is clear that the pro-vision relied on was only intended to apply to the policy when so written.   The distinction between blanket and specific policies is nowhere made clearer than in *Schmaelzle v. London, etc., Ins. Co.,* 75 Conn. 397, 53 Atl. 863, 60 L. R. A. 536, 96 Am. St. Rep. 233.   In that case plaintiff was the owner of certain premises upon which stood a brewery and shed.   The brewery contained machinery and stock.   Upon the buildings, machinery, and stock, the plaintiff carried, in some 34 companies, insurance against fire, aggregating $60,000.   The policies all contained this provision:

"This company shall not be liable under this policy for a greater proportion of any loss on the described property   *   *   * than the amount hereby insured shall bear to the whole insur-ance, whether valid or not, or by solvent or insolvent insur-ers, covering such property."

Distinguishing between the two kinds of policies the court said:

"Thirty-one of the policies covering insurance for $55,000 were of the kind known as blanket or compound policies; that is, they insured said buildings, machinery, and stock as a whole and without distributing the amount of the insurance among the several items.   The remaining policies, containing insurance for $5,000, were of the kind known as specific; that is, the amounts insured thereby were distributed among the several items of property, a specified amount to each item.   Each of these specific policies covered, in the whole, precisely the same property as did the compound insurance, but distributively.   The manner of distribution was uniform among the specific policies, and was among four separate items, to wit, the main or brewery build-ing, stock, machinery, and shed, as follows:   $1,634.88 on the brewery, $1,839.21 on the stock, $1,498.64 on the machinery, and $27.24 on the shed.   .

"* * * The characteristic features of a blanket policy are well understood. Its very essence is that it covers to its full amount every item of property described in it. If the loss upon one portion or item of the property exhausts the full amount of the policy, the whole insurance must be paid; there can be no apportionment of it. In the absence of a prorating clause, one blanket insurer, among many insurers, whether blanket or specific, may be sued, and he must pay the whole loss if it is not in excess of his policy. His payment will give him certain equitable rights of contribution as against his coinsurers, but his legal obligation to pay the assured cannot be questioned. The contract holds him to that. These principles are elementary. 3 Joyce on Insurance, sec. 2492; 1 May on Insurance (3d Ed.) sec. 13; Ostrander on Fire Insurance, sec. 204."

We are, therefore, of opinion that all five of the policies involved were blanket and not specific policies, and that the court did not err in the admission of evidence in support of the allegations of plaintiff's petition.

Defendant, after pleading a general denial, specifically denied the extent and value of the plaintiff's loss as alleged in its petition, and as a further defense set forth the provisions of the policy, *supra,* as governing the extent of its liability, if any. And after alleging that plaintiff had violated the promissory warranty contained in the policy which reads: "* * * That the assured will keep a book containing a faithful record of all cotton put into or taken from the gin or cotton house; and that such record will be produced in case of loss"—charged that plaintiff had failed to keep a record of all the cotton bolls "put into and taken out of each of said warehouses, and failed to produce such record after said fire and when requested so to do by the defendant," and asked to be discharged.

The second assignment involves a consideration of a demurrer to the evidence which the court overruled. It is insisted that the court should have sustained said demurrer because the evidence discloses that plaintiff violated said "book warranty" clause. Not so. On this point there is no dispute as to the facts. Considering the entire record, which we of right should do where, as here, at the close of plaintiff's evidence a demurrer thereto is overruled and defendant introduces other and further

evidence, the evidence discloses that on December 20, 1906, plaintiff was the owner of a cotton gin at Mangum; that the gin connected with a cotton house, some 50 feet long by 20 feet wide, from which the gin drew cotton by means of a suction pipe. On said date plaintiff began to buy and gin boll cotton, and continued so to do up to April 12, 1907, the date of its loss. This cotton came into the ginyard by wagonloads from adjacent farms, and what could not be ginned each day was put into this cotton house, which as the season progressed was enlarged, and reached the final dimensions of 200 feet long, 20 feet wide, and 10 feet high. As the cotton thus accumulated five additional warehouses of the same dimensions were erected by the insured parallel to and within about ten feet of each other, one on the east and four on the west of the original cotton house, some with, others without, floor. Payment for this cotton was made by checks, the stubs of which were preserved by plaintiff, giving the date and number of pounds purchased, the price thereof per hundred, and the total price paid. They disclosed the lowest price paid during those dates to be 50 cents per hundred, the highest to be $1.75, and the average to be $1.29.

At the time four of these policies were issued, that is, on February 21, 1907, these warehouses were complete and practically full of this boll cotton. Thereafter "some 40 or 50 loads" were brought and distributed among them, and on March 4, 1907, the date of the policy in the German-American Company, they were all full, and not a pound of cotton thereafter put into any of them up to the time of the loss. After this insurance was placed on this unginned cotton in these six warehouses, filled as we have stated, cotton continued to arrive and was ginned and a record of the bales of all boll cotton kept and stamped "B" to distinguish it from the custom cotton. At the time of the loss only the cotton from the original cotton house, which was 50x20, as stated, had been removed and ginned. With that exception all six of these warehouses were full at the time of the fire. The books and records of this business kept by plaintiff consisted of the checks and stubs, as stated, daybook, ledger, balebook, which showed the number and weights of the bales of

cotton ginned, and daily reports sent to the secretary and treas-
urer of the company at Chickasha. These reports gave the num-
ber of bales of cotton ginned that day, the weights of the bales,
and the number of pounds of boll cotton used to make a bale.

This much of the evidence is sufficient to show what was re-
quired of plaintiff by said book warranty clause. The case was
tried upon the theory, acquiesced in by all concerned, that plain-
tiff before he could recover was required to show the amount
of boll cotton that went into and was taken from these ware-
houses from December 20, 1906, the date the first boll cotton was
bought. In consequence, the record is voluminous. It is ap-
parent that this book warranty clause was not retrospective in
its nature, and that the book of faithful record required thereby
to be kept was not intended to cover transactions prior to the
date of the execution of the policies. In other words, it re-
quired that plaintiff keep the book referred to beginning with
that date, and show thereby a "faithful record of all cotton put
into or taken from" these warehouses, beginning with the dates
of the policies.

In *Liverpool, etc., Insurance Co. v. Sheffy,* 71 Miss. 919,
16 South. 307, speaking of the duties of the insured under the
"iron safe" clause, the court said:

"His duty was to keep a set of books showing a record of
business thereafter transacted, including future purchases and
sales. He did not consent to preserve indefinitely his old books·
showing all the past transactions."

Thus it will be seen that had plaintiff preserved a faithful
record of the 40 or 50 loads of cotton put into these warehouses
after the date of these policies and the amount of cotton taken
thereafter from the original cotton house, the terms of the war-
ranty would have been performed. Recognizing the fact that
the nonperformance of this warranty was a condition subsequent
and that the allegation of its performance or waiver had no
proper place in the petition, and that its nonperformance was
defensive matter (*Great Western Life Ins. Co. v. Sparks,* 38
Okla. 398, 132 Pac. 1092, 49 L. R. A. [N. S.] 724), defendant
set it up in the answer, upon which issue was joined by reply

of a general denial, and the question for us now to determine is whether the evidence reasonably tends to prove that this condition in the policy was performed by the insured.

It is a general rule that a substantial compliance with this warranty is sufficient. *German Amer. Insur. Co. v. Fuller,* 26 Okla. 722, 110 Pac. 763; *Shawnee Fire Insur. Co. v. Thompson,* 30 Okla. 466, 119 Pac. 985; *Home Insur. Co. v. Ballard,* 32 Okla. 723, 124 Pac. 316. Also, as stated in 2 Cooley's Briefs on Life Insurance, page 1825, it is a general principle that the purpose of the clause is accomplished when the insured produces data from which the amount and value of goods in stock at the time of the fire can be reasonably ascertained. The same authority states, at page 1822, that the requirements of the warranty are met when the insured "shall keep such books in such a manner as that they shall constitute a record of business transactions which a person of ordinary intelligence accustomed to accounts can understand." See, also, *Malin v. Mer., etc., Ins. Co.,* 105 Mo. App. 625, 80 S. W. 56.

Guided by these rules the evidence discloses that in plaintiff's attempt to establish a waiver (which we will not consider) it developed that within a few days after the loss an adjuster for four of the defendant companies and another for the defendant German-American Insurance Company visited the scene of the loss, with power to adjust the same, and that plaintiff turned over to them for that purpose all the records it had kept pertaining thereto, which were the checks, stubs, daybook, ledger, and daily reports aforesaid, which they examined, and therefrom ascertained the amount of cotton in the warehouses at the date of the fire, and agreed with plaintiff what the same was, and the extent of his loss to be 2,640,000 pounds. The evidence fails to disclose any objection to the record kept or any difficulty in arriving at said conclusion or in arriving at the further understanding between plaintiff and the adjusters, in effect, that the only question between them was the cash value of this cotton at the time of its loss and the consequent amount of recovery under each policy. The evidence further discloses that since said adjustment plaintiff had rested in apparent security upon the as-

sumption that said data, once furnished, would no longer be required to be produced by defendant, and has since neglected to preserve it in whole. In consequence the daybook and a part of the daily reports have been lost or destroyed, and were not in evidence at the trial in proof of loss, and consequently are not now before us to aid in determining whether this warranty was substantially complied with. One thing is certain, however, and that is that plaintiff had a right to establish his loss by any competent evidence of his own choosing, and this case falls squarely within the general rule that the purpose of this clause was accomplished when plaintiff produced data from which he satisfied the minds of the adjusters, whom we presume are reasonable men, of the amount of cotton on hand at the time of the fire. As proof of the fact that the data was sufficient from which to reasonably ascertain the extent of the loss, the jury considered substantially that same data, and arrived at substantially the same conclusion as to the amount of loss as was arrived at by the adjusters. We are, therefore, of opinion that the evidence reasonably tends to prove that the plaintiff complied with the requirement of the clause, and hence the court was right in overruling the demurrer to the evidence and letting that question go to the jury. We are also of opinion that, in addition thereto, by showing that it took 2,000 pounds of this cotton to make a bale, and by accounting for the number of bales made from this boll cotton, the evidence reasonably tended to prove the amount of this cotton that went into and was taken from these warehouses up to the time of the loss, and that hence the court did not err in sending the question of the extent of the loss to the jury. There is no merit in the contention that the evidence, introduced to prove said ascertainment of and agreement to the extent of the loss by the adjuster, was incompetent for the reason that the same was made as an offer of compromise, and hence was not admissible in evidence. This for the reason that at the time of said ascertainment and agreement there was no semblance of a controversy existing between the parties to be compromised, and no intimation that one would ever arise over the adjustment and settlement of this loss.

It is next assigned that the court erred in permitting witnesses for the plaintiff to testify as. to the actual cash value of the property on the day of the fire. Defendant says:

"The authorities which we have hereinbefore cited show that before evidence of the actual value. can be introduced or entertained it must be shown that there was no market value, and, the evidence being overwhelming on the point that there was a market value, the evidence of these witnesses was incompetent. All of these witnesses testified that in their opinion the fair, reasonable cash value of this cotton on the day of the fire was $2 per hundred, and each of them also further testified that they based their opinion, not only upon what the cotton was selling for on the day of the fire, but also included in this value the profit which they estimated could have been made out of the cotton by ginning it. * * * The highest price paid for that cotton on the market at Mangum being $1.75, the price that was paid for this cotton on the date of the fire being $1 and the average price being $1.29, it naturally follows .that the market value of this cotton on the date of the fire could not possibly have been $2 per hundred, and in fixing the value at $2 per hundred the jury beyond any question adopted the value as given by the witnesses for defendant in error, and, inasmuch as this evidence was wholly incompetent for the reason that it included unrealized profits, we insist that the verdict of the jury was not sustained by sufficient evidence."

Each of the five policies sued on reads:

"This company shall not be liable beyond the actual cash value of the property at the time any loss or damage occurs."

Accepting the concession made by defendant that cash value and market value are synonymous terms, we think defendant overstates the testimony, and that an examination thereof fairly discloses that most of the witnesses on this point did not include unrealized profits in testifying to the actual cash value of the cotton in the warehouses at the time of the loss. There is no question that all were properly qualified. The witness Pace was asked whether or not he knew the fair cash value of this cotton contained in these warehouses per pound or per hundred pounds at the time of the fire, to which he answered, "Yes," and that in his opinion it was worth $2 per hundred. He further stated that all the cotton destroyed could have been sold on the market

then and there at that price. His testimony failed to disclose that he included in his estimate unrealized profits. The same is equally true of the witness Moore. It was only on cross-examination, after each witness had testified that the fair cash value of the cotton was as stated, that some of them testified that such could have been realized from the cotton after it had been ginned and sold. Upon a careful reading of all the testimony upon this point the most that can be said in favor of defendant's contention is that, after testifying as stated, upon cross-examination they were led to say that $2 per hundred could have been realized net from the cotton after it had been ginned and sold upon the market. But, assuming the full scope of defendant's contention as to what the testimony of some of the witnesses discloses, we cannot say, in view of what this and other courts have held, that the instructions of the court on this point, which are not complained of, constitute reversible error. In *Meeker v. Chicago, etc., Co.,* 84 Ill. 276, the court said:

"In trover for the conversion of steel ingots, there was no direct proof of their market value at the time of the conversion, but it was proved that steel made from such ingots was worth a certain sum per pound, and how much it would cost to convert the ingots into merchantable steel. *Held,* that the proof furnished sufficient data to enable the jury to approximate the value of the ingots by taking the cost of converting them into steel from the market value of merchantable steel."

In *Chicago, R. I. & P. Ry. Co. v. Johnson,* 25 Okla. 760, 107 Pac. 662, 27 L. R. A. (N. S.) 879, we said:

"The measure of damages for the destruction of a growing crop is its value at the time and place, and in the condition it was in, when destroyed. * * * It is permissible as a means of arriving at the value of a growing crop to prove its probable yield under proper cultivation, the value of such yield when matured and ready for sale, and also the expense of such cultivation, as well as the cost of its preparation and transportation to market; the difference between the value of the probable crop in the market and the expense of maturing and placing it there, in most cases, will give the value of the growing crop with as much certainty as can be attained by any other method."

In *Gulf, C. & S. F. Ry. Co. v. Sumrow* (Tex. App.) 18 S. W. 135, it is held that:

"It is not error to admit the evidence objected to by appellant, as to the damage done to appellee's crop. It is evident from appellee's claim that it was for damages for the partial destruction of his matured, but ungathered cotton crop. In arriving at an estimate of such damage it was competent for him to prove that the cotton destroyed would have made, when gathered, ginned, and baled, three average bales, and that the market value of said three bales would have been $40 each, less the expense of gathering, ginning, and baling, which would have been $10 per bale. Such evidence with reasonable certainty fixed the market value of the ungathered cotton which had been destroyed. If the cotton destroyed had not been matured at the time of its destruction, a conjectural estimate of what the crop would have produced would not have been sufficient or admissible evidence to prove market value."

And so we say that the average price plaintiff paid therefor between December 20, 1906, and the date of its loss had nothing to do with the cash value of the cotton at that time, and, in view of the fact that this was the first season that boll cotton was attempted to be ginned, and, so far as the evidence discloses, it did not have at that time a strictly market value in that community, we are of opinion that the court did not err in permitting the witnesses to state, after they had testified that the actual cash value was $2 per hundred, and that such it would bring on the market there at that time, to further state, on cross-examination, not only that, but, in their opinion, it would net that amount after it had been ginned and sold upon the market. As stated in *C., R. I. & P. Ry. Co. v. Johnson, supra,* this we think is in keeping with the weight of authority.

Neither did the court err in refusing to instruct the jury to return a verdict for defendant, nor in overruling the motion for judgment *non obstante,* nor was it "impossible to apportion the loss or to ascertain the liability of any company without knowing the amount of loss or damage in each warehouse." Each of the five policies sued on was a blanket policy, and insured as one item the cotton in plaintiff's six warehouses for $5,000. In evidence was introduced three other blanket policies issued prior thereto by the Virginia State Insurance Company to plaintiff, insuring as one item three of said warehouses in the total

sum of $2,500. Each policy contained the three-fourths loss clause, *supra,* and provided that in the event of additional insurance thereon "this company shall be liable for its proportion only of three-fourths of such loss on each item not exceeding the amount insured on each such item." Which meant that each company should bear its own proportion of three-fourths of the loss. In other words, it meant just what the clause meant in *Page et al. v. Sun Insur. Co.,* 74 Fed. 203, 20 C. C. A. 397, 33 L. R. A. 249, which was that each company should not be liable for a greater proportion of any loss than the amount of insurance it had placed thereon bore to the whole insurance. Which means that, as the total amount of this blanket insurance is $27,500, and three-fourths of the loss is $38,555.39, the share of that amount to be paid by each of the these five defendants is 5000-27500 of that amount, or more than $5,000, rendering apportionment unnecessary. It follows that it was unnecessary to know the amount of loss or damage in each warehouse before the plaintiff could recover, and that the jury did right to find against defendants for the full amount of their respective policies. For the reason that the Virginia Company is not before us, what we might say concerning their contribution to this loss would not be binding on them. But it might be said in passing, their proportion of the loss may be ascertained in the same way. In *Page et al. v. Sun Insur. Co., supra,* plaintiffs were the owners of certain building material situated on two certain blocks in a certain city. A fire caused a loss of some $30,000 on that portion of the property situated on the westerly block, but caused no damage or loss upon the property situated upon the other block. At the time of the fire the plaintiffs held policies of insurance to the amount of $40,000 on the entire property situated on both blocks, and policies to the amount of $10,000 upon that portion of this property situated on the westerly block. One of the latter group of policies was for $2,500, and was issued by the Sun Insurance Company, and contained a clause in effect the same as in the instant case. In a suit on the $2,500 policy the court held that both the $10,000 insurance on the westerly block only and the entire $40,000 insurance upon the property of both

blocks covered the property situated on the westerly block and described in the policy sued, and that the plaintiffs could recover only 2500-50000 of the amount of the loss on this policy. There, as here, both were blanket policies, and Sanborn, Circuit Judge, affirmed the judgment of the trial court.

There are other assignments of error, and among them it is sought to question admissibility of evidence and certain charges to the jury. We have examined them all, and, finding no reversible error, and believing that substantial justice has been done, the judgment is affirmed.

All the Justices concur.