Argued June 30, affirmed July 25, modified on rehearing September 12, 1916.

## CARLTON LUMBER CO. *v.* LUMBER INS. CO.

### (158 Pac. 807; 159 Pac. 969.)

**Insurance—Fire Insurance—"Blanket Policy."**

1. A blanket policy of fire insurance covers to its full amount every item of property described in it, and, if the loss of any portion of the property exhausts the full amount of the policy, the whole insurance must be paid; hence the existence of an average clause in a blanket policy involves a contradiction of terms (citing Words and Phrases).

**Reformation of Instruments — Insurance Policy — Evidence — Sufficiency.**

2. Where plaintiff, lessee of a sawmill, installed new equipment and took out insurance policies thereon, evidence *held* sufficient to require reformation of such policies by striking therefrom an average clause, thus making them a "blanket policy."

**Insurance—Reformation of Policies—Carelessness of Insured in Examining Policies.**

3. The carelessness of the insured in not examining insurance policies, *held* not of such character as would prevent the reformation of the policy by striking therefrom an average clause, thus making the policy a blanket policy.

> [As to right of insurer to rely on conditions in fire insurance policy not issued in accordance with oral contract, see note in Ann. Cas. 1914D, 653.]

From Multnomah: WILLIAM N. GATENS, Judge.

Department 1.    Statement by MR. JUSTICE McBRIDE.

This is a suit by the Carlton Lumber Company, a corporation, against the Lumber Insurance Company,

a corporation, to reform two insurance policies issued by the defendant, covering new equipment added by plaintiff to the sawmill plant at Carlton, Oregon; each policy being for the sum of $5,000. The plaintiff was the lessee of the Carlton Consolidated Lumber Company, and by the terms of its lease was required to and did carry $200,000 insurance for the benefit of its lessor. The two policies involved in this suit were for its own account and intended with other insurance, to cover the new equipment added by plaintiff. The first policy was issued in February, 1914, and contained an average clause reading as follows:

"Insurance under this policy is hereby understood to attach to each of the above locations, namely, sawmill, sawmill engine-room, resaw sheds and equipment, sorting-works, lumber-stacker, planing-mill, and general plant, in the proportion that the value of new equipment at each location bears to the total value of the new equipment at all locations."

The second policy, actually issued September 14, 1914, but to take effect as of July 30, 1914, contained a similar average clause. A fire occurred in the plant on August 12, 1914, injuring and destroying the new equipment to the extent of the total insurance thereon. The only written evidence of the second contract of insurance here mentioned is contained in a letter written by plaintiff's agent to defendant and is dated July 30, 1914, being as follows:

"July 30, 1914.
"Mr. Philip Buehner, Portland, Oregon.
    "Dear Sir:
        "Carlton Lumber Co., Carlton, Oregon.
    "Confirming my conversation with you this afternoon, this is to advise you that we are protecting $5,000 additional on your blanket form covering new improvements situated anywhere on the plant. Please accept this letter as sufficient evidence that you are properly

protected. We understand that this insurance attaches according to the wording attached to our policy #94713 for $5,000, dated February 3d. We understand that the forms are being adjusted, and I shall see you Saturday and talk this situation over with you fully. Thanking you for this additional business, we are,                                     Yours truly,
                 "LUMBER INSURERS' GENERAL AGENCY.
                           "WALTER S. JELLIFF."

· The controversy between the parties is this: Plaintiff contends that after taking the inventory in July, 1913, it was found desirable to take out further insurance upon equipment, and that it was also desirable, for reasons which are stated in the opinion, to eliminate the average clause from the February policy issued by defendant so as to have all its policies correspond, in fact, to make them all "blanket" policies; that plaintiff's president, Mr. Buehner, discussed this with Mr. Jelliff, defendant's general agent in Portland, and it was agreed that Jelliff should prepare a new form of rider covering plaintiff's wishes in this respect, and that plaintiff should take the $5,000 policy in the defendant company; that such form of rider was actually prepared by Mr. Jelliff and agreed to by Mr. Buehner and the premium paid on the new policy; that the amended form of rider was given by Buehner to Jelliff at the latter's request with the intention and expectation that it would be attached to the February policy and to the one then to be issued, but that by mutual mistake or oversight it was not substituted on the February policy, nor upon that issued as of July 30, 1914, and on the contrary the average clause was retained in both, being overlooked by plaintiff. The case was put at issue by appropriate denials, and upon the trial there was a decree for plaintiff re-

forming the policies as prayed for, from which the defendant appeals.

AFFIRMED.   MODIFIED ON REHEARING.

For appellant there was a brief over the name of *Messrs. Veazie, McCourt & Veazie,* with an oral argument by *Mr. J. C. Veazie.*

For respondent there was a brief and an oral argument by *Mr. James G. Wilson.*

MR. JUSTICE MCBRIDE delivered the opinion of the court.

The whole controversy turns upon the agreement as to the elimination of the average clause. It is important here for this reason: Plaintiff was partly insured in other companies not having this average clause, but containing a stipulation that in case he should take out other insurance by policies containing an average clause the first insurers should be entitled to share the benefits of such averages. Without going into the details of the various negotiations in regard to the policy issued as of July 30, 1914, and covered by the letter dated July 30, 1914, heretofore quoted, we are of the opinion that the contract between the parties was for a blanket policy eliminating the average clause not only as to that policy, but from the rider in the February policy. Otherwise the letter quoted can have no meaning.

1. The existence of an average clause in a blanket policy would involve a contradiction of terms. A blanket policy is defined by the Supreme Court of Connecticut as follows:

"The characteristic features of a blanket policy are well understood. Its very essence is that it covers to

its full amount every item of property described in it. If the loss upon one portion or item of the property exhausts the full amount of the policy, the whole insurance must be paid; there can be no apportionment of it. In the absence of a prorating clause, one blanket insurer among many insurers, whether blanket or specific, may be sued, and he must pay the whole loss if it is not in excess of his policy. His payment will give him certain equitable rights of contribution as against his coinsurers, but his legal obligation to pay the assured cannot be questioned. The contract holds him to that. These principles are elementary: 3 Joyce, Insurance, § 2492; 1 May, Insurance (3 ed.), § 13; Ostrander, Fire Ins., § 204''; *Schmaelzle* v. *London etc. Ins. Co.*, 75 Conn. 397 (57 Atl. 863, 96 Am. St. Rep. 233, 60 L. R. A. 536).

See, also, *Scottish Union & National Ins. Co.* v. *Moore Mill & Gin Co.*, 43 Okl. 370 (143 Pac. 12); and generally Words and Phrases, title "Blanket Policy." The evidence of Mr. Buehner and of Mr. Jelliff agrees this far: That Jelliff was soliciting the last policy of insurance; that Mr. Buehner was dissatisfied with the form of defendant's policy theretofore issued; and that Jelliff prepared a form of rider eliminating the average clause, which would in effect have made the policies blanket policies, and gave several copies of it to Buehner. Jelliff says that the form was merely tentative and was not accepted by Buehner, but held up until he could consult Mr. Epperson of the Lumbermen's Underwriting Alliance, at Kansas City, in regard to it, which institution also held policies upon substantially the same property. Buehner testifies that the contract was to go into effect at once and that Jelliff came to his office and got the form he had himself prepared and which they had agreed upon for the purpose, as Buehner supposed, of preparing riders for the policy to be is-

sued and for the one already in force.   We are of the
opinion that Buehner's version of the transaction is
the correct one, and that the letter of July 30, 1914,
while vague in some particulars, can be explained on
no other theory.   The words, "Confirming my conver-
sation with you this afternoon, this is to advise you
that we are protecting $5,000 additional on your
blanket form covering new improvements," etc., are
significant.   There was no other blanket form except
the one under consideration, the one that Jelliff had
prepared and retaken from Buehner's office, and it is
hardly probable that the letter would have been writ-
ten referring to this form and informing Buehner that
the insurance would be under it if he had not already
agreed with Buehner in regard to it.   The further
words, "Please accept this letter as sufficient evidence
that you are fully protected," would have been false
upon their face if it were the intent of the writer to
notify Buehner that the policy to be issued would con-
tain the average clause, the objection to which was
that it would not fully protect him.   The additional
words, "We understand that this insurance attaches
according to the wording attached to our policy
No. 94713 for $5,000, dated February 3d," are some-
what ambiguous; but the meaning of the preceding
language is clear, and it is probable that the clause
last quoted did not clearly express the writer's mean-
ing.   The subsequent words, "We understand the
forms are being adjusted, and I shall see you Saturday
and talk the situation over with you fully," would in-
dicate that the preceding words quoted, "According to
the wording attached to our policy No. 94713," were
intended to apply prospectively to that policy as it
would appear when the new form agreed upon had

81 Or.—26

been prepared.    Else why speak of adjusting forms if only one form remained to be prepared or adjusted?

It is urged that a letter written by Mr. Buehner to Mr. Epperson supports Jelliff's claim that the blanket form prepared by him had not been accepted by plaintiff.    The substance of the letter is as follows:

"Inclosed please find a form that we have taken up with the local office here in regard to the plant account and the lumber in and about the mill, which takes the mill rate.    As you no doubt know, the Carlton Lumber Company leased the mill of the Carlton Consolidated Lumber Company with the understanding that all new machinery and all additions to the plant must be put in by the Carlton Lumber Company, and that we must carry our own insurance covering this improvement.    We have a book in which we have all the items enumerated, which covers the cost of the plant that the Carlton Lumber Company has put in, in order to enable us accurately to ascertain at any time, in case of fire, the cost of the work that the Carlton Lumber Company has put in and all records up to date.    I would ask you whether you think it would be advisable to make a copy of this list, which would mean five or six pages, and attach it to the policies, as we do not care to have any dispute in case of fire. We intend to place the insurance on the lumber in the dry shed, planer shed, dry kilns, and all the lumber in and about the mill, in one policy with one company, and we would like to do the same with our plant account, putting it, say, with one or two companies, having all the forms exactly the same.    Our plant account, including the stable plant, is about $35,000, with some deductions on account of foundations and support."

The only suggestion asked in this letter is as to whether it would be advisable to attach a list of new machinery and additions to the plant to their policies. There is not one word in it asking for any suggestion as to the form of rider inclosed, and the letter is more

a notification to these people of the form of rider the insurer proposed to adopt respecting all insurance than a request for advice, except as to a matter not connected with the form.  The answer indicates that Mr. Epperson so understood it.  He makes no suggestion as to the form of rider, but does make a suggestion as to the matter of attaching lists of the property to the policies, and intimates a desire to participate in future insurance.

2. Much as we should desire for the satisfaction of counsel to discuss in detail the evidence, both oral and written, upon which we base our conclusions, it is impossible to do so and compress our opinion into any reasonable space.  The discussion of it in the appellant's brief consumes what would be the equivalent of 40 or 50 pages of the Oregon Reports, and yet it is not unnecessarily long.  It would be of no general interest, and the law in regard to the reformation of insurance policies is so well settled that there is practically no dispute between counsel in regard to it.  We are fully satisfied that it was the contract and intent of the parties that, in consideration of the insurance covered by the July 30th policy being given by the plaintiff to the defendant company, a rider in the form set forth in plaintiff's complaint should be attached to it, and that a like rider should be substituted on the February policy and that by mistake this was omitted.

3. That the plaintiff was somewhat careless in not examining the policies issued more carefully is, perhaps, true; but this negligence should not prevent relief.  There are few, if any, cases where the aid of equity is asked to reform mistakes in written instruments in which there is not disclosed some degree of negligence by the injured party, and this is particularly true as to insurance policies.  The average per-

son insured describes his property to the agent, pays his premium, receives his insurance policy, and goes on his way rejoicing, usually not reading it, and not understanding half of it if he does read it. It is in evidence here that plaintiff's president did not understand the difference between a blanket policy and one containing the average clause until rival insurance agents enlightened him, and that this information was the cause of his determination to have all his policies blanketed. It is to the credit of insurance companies that as a rule they usually keep their promises and give the insured the kind of policy they agree to give him, and this fact has led the insuring public to accept policies issued by reliable companies without thorough examination. To hold that plaintiff cannot recover because its officers did what nearly everybody else does, namely, accepted the policies sent them without an industrious, technical examination of their contents, would be unjust.

Believing that the findings of the court below are fully sustained by the testimony, the decree will be affirmed.        Affirmed.    Modified on Rehearing.

Mr. Chief Justice Moore, Mr. Justice Burnett and Mr. Justice Benson concur.

Modified September 12, 1916.

ON PETITION FOR REHEARING.

(159 Pac. 969.)

*Messrs. Veazie, McCourt & Veazie,* for the petition.

*Mr. James G. Wilson, contra.*

Department 1.   MR. JUSTICE McBRIDE delivered the opinion of the court.

The petition for rehearing challenges the right of the Circuit Court to allow interest on the amount recovered, from the tenth day of December, 1914, to the fifteenth day of April, 1915, the date of the decree entered in that court.   Upon the authority of *Richardson* v. *Investment Co.,* 66 Or. 353 (133 Pac. 773), and *Sargent* v. *American Bank & Trust Co.,* 80 Or. 16 (156 Pac. 431), such allowance was erroneous, and the decree will be modified so as to eliminate that item. In all other respects we adhere to the views expressed in our former opinion.      MODIFIED ON REHEARING.

MR. CHIEF JUSTICE MOORE, MR. JUSTICE BURNETT and MR. JUSTICE BENSON concur.