Argued February 7, affirmed April 3, 1957

# MOCK et al *v.* GLENS FALLS INDEMNITY CO.
## 309 P. 2d 180

72

*Windsor Calkins* argued the cause for appellant. On the brief were Calkins & Calkins, Eugene.

*Ray G. Brown,* Portland, argued the cause for respondents. With him on the brief were Bartle & Allen, Eugene.

Before Perry, Chief Justice, and Lusk, Warner and Kester, Justices.

KESTER, J.

This is a suit to reform a policy of liability insurance and to recover on the policy as reformed. Plaintiffs seek to date the policy back to the time of an alleged oral agreement between plaintiffs and the agent of the defendant insurance company, so as to cover a claim for damages arising out of an accident which occurred between the date of the oral agreement and the date of the policy as written. From a decree awarding plaintiffs the requested relief, the insurance company appeals. Since the case is tried here de novo, we will state the evidence rather fully.

The seven plaintiffs are partners engaged in the used automobile business in Eugene. Defendants George H. Pratt and Mrs. J. K. Pratt operate a general insurance agency in Eugene and are authorized by the company and licensed by the state of Oregon as agents of the defendant Glens Falls Indemnity Company. As such they are empowered to bind the company by countersigning, issuing and delivering policies. While the complaint asks for judgment against "the defendants," a money judgment is sought only "on the policy as reformed." Therefore, no relief is sought against the insurance agents individually, and the trial court dismissed the case as to them, from which no appeal has been taken. Hence, when we speak of the defendant, it will refer to the Glens Falls Indemnity Company.

As a part of plaintiffs' automobile business they purchase automobiles at other places and have them driven to Eugene, sometimes from considerable distances. These are known in the trade as "driveaways," and they are generally regarded as extra-hazardous from an accident standpoint, because the drivers are not personally known to the dealers and many of the

drivers are irresponsible. It appears from the evidence that insurance companies generally are reluctant to undertake such risks.

Plaintiffs had carried liability insurance with defendant, through the Pratt agency, since 1947, and their insurance account developed into a substantial one. In 1949 or 1950, plaintiff A. W. (Sam) Mock, who handled the insurance part of plaintiffs' business, became licensed as an insurance solicitor for the Pratt agency, so that he could receive commissions on both the plaintiff's own business and other policies which he wrote. Subsequently, on April 1, 1951, he received an agent's license to write collision, comprehensive, fire and theft insurance for another company. He disclaims any experience in the field of liability insurance.

On March 7, 1951, plaintiffs had in effect a policy of garage liability insurance with defendant, numbered GA 10507, originally issued September 22, 1948, and renewed for subsequent periods until September 22, 1951. As a part of the events hereafter mentioned, this policy was cancelled as of July 2, 1951. Attached to the policy was an endorsement excluding coverage for driveaways, except such as originated within the state of Oregon. The policy itself is not in evidence, as it was redelivered to the defendant upon its cancellation, and it was subsequently destroyed. However, it has been reconstructed from a specimen copy and the "daily report."* While that policy contains provisions

---

* A "daily" or "daily report" is a copy of the first page of the policy, containing the policy period, type of coverage, limits of liability, premium computation, declarations, etc., together with copies of endorsements, but without the full printed text of the policy. It is used by the agent as a means of reporting to the company the issuance of the policy (hence the name "daily report"), and by both the agent and the company as an office record of the policy. When the information on the "daily" is assimilated with a specimen of the form of the policy used, the policy itself can be reproduced.

purporting to limit the authority of agents, in the view we take of the case those limitations are not controlling.

On March 7, 1951, plaintiff A. W. Mock was notified by a sheriff in Montana that one of plaintiffs' driveaways had been involved in an accident in that state. Mock reported the accident by phone to George Pratt, of the Pratt agency, and a short time later Pratt called back and told Mock that the accident was not covered because of the driveaway exclusion. In the ensuing discussion Mock stated that he wanted driveaway coverage for the future; and Pratt said that he would get such coverage for plaintiffs, and that such risk was covered from that time on. The testimony leaves no doubt, and it was agreed by counsel at the time of argument, that both Mock and Pratt intended the driveaways to be covered from the moment of that conversation.

Pratt asked Mock to bring in the policy, which was done; and Pratt then tore off the exclusionary endorsement and sent it in to the defendant's San Francisco office, stating that plaintiffs wanted driveaway coverage. On March 29, 1951, defendant wrote back to the Pratt agency stating "this company is not interested in extending this coverage," and returning the endorsement for attachment to the policy. Defendant further stated that it had been unsuccessful in finding a concern that would accept the coverage, but that it would continue that inquiry.

Pratt then called Mock and told him that the company would not take the endorsement off, but that he would get or write a different policy that would give driveaway coverage, and that in the meantime plaintiffs would continue to be covered. Sometime between mid-April and mid-May, 1951, plaintiffs took a buying trip into California for driveaways, and before doing

so A. W. Mock called Pratt to make sure that they would be covered, and again Pratt assured them that they were covered.

The testimony indicates that after receipt of the March 29 letter, the arrangement between Pratt and Mock was intended to be both: (1) an agreement to insure, i.e. to issue a policy in the future; and (2) a present agreement of insurance, i.e. an interim insurance contract pending issuance of the actual policy. Mock's testimony is fairly represented by the following passages:

"* * * and why I made this particular point to call, George had called me telling me that the company—I believe I remember this correctly—was that he had taken the endorsement off in the meantime and sent it in and the company wouldn't accept it. They sent it back stating that they weren't going to take this endorsement off and that was why I called him when I made this trip, and he said in the meantime he would continue to cover us. That he was going to get this policy a different way and that was the reason I called at the time we were going back out of state as I told him I had to be sure. He said, 'I will cover you. You're covered as far as this is concerned and we will get a policy written.' That's when the comprehensive liability policy came in. He was writing a new type of policy.

"* * * * *

"Q Now, on or about March 7, 1951, you indicated that after this instance Mr. Pratt told you that you were covered. Is that right?

"A That's right.

"Q On this drive-a-way proposition?

"A That's right.

"Q Did he ever call you back and tell you that you were not covered?

"A No, sir. He never called me back to tell me I wasn't covered, he called me back thirty or

forty days later to say that the company would not take the rider off from the policy, but he would continue to cover me.

"Q Then he was saying as far as the company was concerned they weren't going to cover him but that he would personally cover you. Is that what he said?

"A No, sir. He said that the company had refused to take the rider off and he would have to write a different type of policy."

Pratt testified:

"A I told him—I phoned him—Mr. Mock, the same day that I got this letter and told him that this happened. And Sam said, 'Well, I don't care; I want that coverage. I don't care how you get it; I want it.' He said 'It's important to me.' So, I said, 'All right. I will get it for you.' And I—

"Q Now, did you know then, on or about March 29, after you had heard from the company; did you know from that time on the company was not willing to cover drive-a-ways in that present policy?

"A That is right. I am positive of that.

"Q And that they would not allow the exclusion to be deleted?

"A That's right, they stated so in their letter."

Pratt attempted to get driveaway coverage from Lloyds of London, but he felt the premium was too high, and he finally concluded to write a comprehensive liability policy with Glens Falls. This was a broader form than the garage liability policy, and it would include driveaway coverage along with various other coverages not provided in the original garage liability policy. The premium for the new policy would be higher than for the old one, not only because of the additional coverage, but also because the limits were to be higher.

The new policy, No. CL 106521, was issued by Pratt

on behalf of the defendant, and it was dated July 3, 1951, reciting a policy period of July 2, 1951, to July 2, 1952. The old garage liability policy was cancelled as of July 2, 1951, the effective date of the new comprehensive policy; and the unearned premium was credited on the advance premium for the new comprehensive policy. The pleadings admit that the new policy was delivered on or about July 2, 1951.

Pratt testified that he discussed the new policy with Mock about July 2, 1951, and that they then agreed to date it as of that day. He also said that he asked Mock if there had been any more accidents, and that Mock replied that there had not been. Mock, however, did not recall any such conversation, and he said that the policy was mailed to him without any discussion. On the oral argument, counsel for defendant stated that defendant is not relying on any agreement to date the policy July 2.

On receipt of the new policy Mock paid no attention to its date, but merely filed it away. He says he assumed that it covered driveaways from the time of the March 7 conversation. Subsequently defendant's San Francisco office discovered errors in the rate computation, so it rewrote the policy, giving it No. CL 108983, and on July 23, 1951, sent it to Pratt for delivery to Mock, with instructions to pick up and cancel policy CL 106521, which was done. This third policy (the second on the comprehensive form) was also dated July 2, 1952, reciting a policy period of July 2, 1951, to July 2, 1952. Again, Mock paid no attention to the dates on the policy, relying on his conversations with the agent. This last policy was subsequently renewed for the period July 2, 1952, to July 2, 1953; and it was cancelled as of September 5, 1952, after this controversy arose.

The testimony is not clear as to whether a premium was paid for driveaway coverage between March 7 and July 2, 1951. It is agreed that, other factors being equal, a policy extending driveaway coverage would require a higher premium than one that did not. All the policies were on an audit premium basis.† Both the advance and final premiums were included in the agent's regular monthly billing to plaintiffs, and Mock testified that he paid all the premiums that were billed to him. However, the final audit for each policy would normally pick up only the exposures that were shown on the policy for the period shown by the policy, and the audit would not ordinarily reflect an oral agreement to make a policy effective prior to its written date. Therefore, we assume that the premiums billed included driveaway coverage only from and after July 2, 1951.

In July or August, 1952, plaintiffs first became aware of an accident in which one of their driveaways, en route from out of the state, had struck a pedestrian named Zitewitz, at Salem, on June 30, 1951. Their knowledge came by means of a letter from Zitewitz's attorneys, which plaintiffs referred to the defendant. The defendant denied coverage for the accident on the ground that it preceded the driveaway coverage; and when Zitewitz filed an action for damages against plaintiffs, defendant refused to defend the case. The Zitewitz claim was ultimately settled by plaintiffs for

---

† By "audit premium" it is meant that the premium stated in the declarations is only an estimate. The actual premium is based on factors such as the insured's payroll, gross sales or receipts, number of operations, and the like, which are some indication of the extent of the insured risks. The estimated premium is paid in advance, and upon termination of the policy, the actual earned premium is computed by an audit of the insured's records, and the difference is either paid by the insured or refunded by the company.

the sum of $6,500, and it was stipulated in the trial court that such settlement was reasonable. It was further agreed that the $1,000 attorneys' fees paid by plaintiffs in connection with that case was a reasonable sum.

The trial court found, in accordance with plaintiffs' contention, that:

"* * * it was the intention of George H. Pratt as insurance agent for Glens Falls Indemnity Company to provide plaintiffs with the coverage requested on March 7, 1951, as of that date, and that the policy of insurance subsequently issued and dated July 2, 1951 providing drive-away protection, should be reformed and effective beginning March 7, 1951, so as to protect plaintiffs on the Zitewitz claim."

Based thereon the court entered a decree reforming the policy and gave judgment in favor of plaintiffs and against defendant Glens Falls Indemnity Company for the $6,500 paid in settlement of the Zitewitz claim, the $1,000 attorneys' fee paid by plaintiffs, and for $500 attorneys' fee in this case.

■ It is settled that a sufficiently definite oral agreement of insurance, by a general agent, is valid in this state (e.g. *Bird v. Central Mfg. Ins. Co.*, 168 Or 1, 120 P2d 753), at least in the absence of a required statutory form of policy (*Salquist v. Oregon Fire Relief Assn.*, 100 Or 416, 197 P 312). In general, see Vance on Insurance (3rd ed) 336; Appleman, Insurance Law and Practice § 7191 et seq.; Couch, Cyclopaedia of Insurance Law § 78; Annotations 15 ALR 995, 69 ALR 559, 92 ALR 232. In our opinion the various elements of such a contract, as set forth in the Bird case, are amply met in this case.

■ Defendant concedes that, in the absence of ex-

press direction to the contrary, Pratt had authority to bind the company in the issuance of policies; and that when Pratt removed the exclusionary endorsement from the original garage liability policy on March 7, the effect was to extend that policy to cover drive-aways. It contends, however, that when the company, on March 29, refused to agree to that extension, and that refusal was communicated to Mock, the effect was to restore the exclusion and to limit thereafter any authority Pratt might otherwise have had to agree to such coverage. In effect, defendant puts its case on the ground that Pratt had no authority to bind the company in contravention of its express instructions, which had been communicated to the insured. Defendant also urges that the existence of the Zitewitz claim, unknown to both parties, created a lack of mutuality, so that the proper remedy is rescission rather than reformation.

Plaintiffs, on the other hand, contend that under the statute defining insurance agents (ORS 736.005 (3) (d)) an agent must necessarily have authority to effect contracts of insurance in behalf of the company, and that any attempted restriction on such authority is invalid. Therefore, since Pratt agreed that "he would cover" plaintiffs for driveaways, plaintiffs argue that defendant was bound notwithstanding its attempted refusal. Plaintiffs also point to the fact that defendant did eventually extend such coverage by the comprehensive form of policy, to show that the attempted restriction on Pratt's authority was not absolute but merely relative to the form of policy on which such coverage should be undertaken.

We agree with the latter contention, and in our view that is determinative of the case, so that it is unnecessary to consider the other questions. Since the

company was willing to cover driveaways under a comprehensive policy (shown by its issuance of policy CL 108983 directly from the San Francisco office, after it had specific knowledge of plaintiffs' driveaway operations, and the subsequent renewal of that policy without objection), its refusal to delete the exclusion from the original garage liability policy must be regarded merely as a limitation on the agent's authority to cover driveaways by means of that particular type of policy. Assuming, without deciding, that such a limitation was valid, it did not prevent him from covering driveaways under the comprehensive form of policy, as was in fact done.

■■ The question, therefore, is not one of the authority of the agent (as his authority is conceded, in the absence of an express limitation) ; but merely, what was the intention of the parties as to the effective date of the comprehensive policy? If plaintiffs and the agent intended the driveaway coverage to be effective prior to the accident of June 30, 1951, but through mistake it was not so written, then the policy may be reformed to conform it to the oral contract. *Holden v. Law, Union & Rock Ins. Co.,* 63 Or 253, 127 P 547; *Carlton Lumber Co. v. Lumber Ins. Co.,* 81 Or 396, 158 P 807, 159 P 969; *Gregan v. Northwestern Ins. Co.,* 83 Or 278, 163 P 588.

We think the evidence establishes that after the company had refused to delete the exclusion from the original policy, the agent made a new agreement to cover plaintiffs with respect to driveaways, on a comprehensive form of policy. The effect of that agreement was to give present coverage; and when the policy was later issued, it related back to the date of that agreement. The trial court erred in dating the policy back to the March 2 agreement, rather than to

the agreement which followed the March 29 letter, but since the accident did not happen until June 30, that error is immaterial so far as this case is concerned.

■ With respect to defendant's contention that the Zitewitz claim was an unknown fact which prevented mutuality of agreement, suffice it to say that the agreement must be viewed as of the time when it was made— shortly after March 29—instead of the time when the policy was delivered; and at the time of the oral agreement the accident had not yet happened. It is not a case of an oral agreement at the time of delivery to give the policy retroactive effect, but rather an oral agreement following the March 29 letter to give present coverage of prospective effect.

■ The fact, if it be a fact, that premiums may not have been paid for the period between the oral agreement and July 2 is not fatal, because the course of dealing between the parties contemplated the extension of credit until billings were sent (*Johnson v. Prudential,* 120 Or 353, 252 P 556), and in any event plaintiffs would be liable for the premium shown by the rate schedules on file with the insurance commissioner (*Ocean Accident & Guarantee Co. v. Albina,* 122 Or 615, 260 P 229).

■ Plaintiffs have requested the allowance of an additional attorneys' fee in this court under ORS 736.325 (2), and such allowance is proper. Under the circumstances an additional fee of $350 is reasonable for services in this court.

The decree is affirmed, with costs to plaintiffs, and the mandate will provide for judgment in favor of plaintiffs for an additional $350 attorneys' fee in this court.